UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:12-CR-57-GFVT-HAI-1 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| ROGER D. KING, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

The Court considers Defendant Roger D. King's Motion to Suppress Evidence, which District Judge Van Tatenhove referred to the undersigned for a recommended disposition. Having reviewed the evidence, briefs, and arguments presented, the Court, for reasons stated below, hereby **RECOMMENDS**[1] that the District Court **DENY** Defendant's Motion to Suppress Evidence (D.E. 80).

## I. BACKGROUND

On November 15, 2012, a federal grand jury returned an indictment charging Defendant with conspiracy to knowingly and intentionally manufacture 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 846. D.E. 1. Following his initial appearance and arraignment, Defendant, through counsel, filed a timely Motion to Suppress Evidence. D.E. 80. In his motion, Defendant challenges both a warrant-backed search of his residence on February 1, 2011, and a consent search of his residence arising out of a knock and talk on February 1, 2012. *Id.* at 1. Specifically, Defendant alleges that the 2011 warrant was invalid for failing to comply with the requirements of the

---

[1]       The parties shall take notice of the shortened objections period set at the end of this Recommended Disposition.

Fourth Amendment, *id.* at 3, and that the 2012 entry into, and subsequent search of, his residence were improper because they failed to fall within an exception to a warrant requirement.  *Id.* at 6-7.  Defendant requested an evidentiary hearing as to the circumstances of the 2012 entry and search, but did not request a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), as to the 2011 warrant-backed search.  *Id.* at 1.

In its response brief, the United States argues that sufficient facts in the search warrant affidavit supported issuance of the 2011 warrant.  D.E. 82 at 2-3.  Alternatively, the United States argues that a good faith exception precludes suppression in the event that the Court finds that the warrant lacked probable cause.  *Id.* at 3-4.  The United States also argues that the 2012 search was permissible because both Defendant and Co-Defendant Glenda Gray provided consent for the officers to search the residence.  *Id.* at 4-5.  The United States attached a copy of the affidavit and search warrant at issue to its response.  D.E. 82-2.

After reviewing the motion and response and conducting a telephonic conference with both counsel, D.E. 85, the Court conducted an evidentiary hearing on March 21, 2013.  D.E 97.  At the evidentiary hearing, the United States called two witnesses, and the defense called one witness.  *Id.*; D.E. 98.  All three witnesses were law enforcement officers that participated in the February 1, 2012 knock and talk and subsequent search of Defendant's home.  Because of the distinct roles played by each officer, the Court will summarize relevant testimony of all three officers in distinct sections, then turn to the 2011 search warrant and the parties' positions following the hearing.

**A. Trooper Armstrong's Testimony**

The first witness for the United States was Trooper Jesse Armstrong of the Kentucky State Police.  D.E. 103 (Transcript) at 11.  Per his testimony, Trooper Armstrong's online review of pseudoephedrine purchases led to the knock and talk and subsequent search on February 1, 2012.  *Id.* at 12.  Specifically, Trooper Armstrong discovered that Defendant King and Co-Defendant Glenda Gray had purchased Sudafed earlier in the day on February 1, 2012.  *Id.* Trooper Armstrong also found out that both individuals had purchased Sudafed "several months in a row."  *Id.*  These purchases occurred at pharmacies outside of Jackson County (where Defendant resides), including one located approximately a fifty minute drive from Defendant's residence.  *Id.* at 41-42.  Additionally, Trooper Armstrong testified that he was aware that Defendant had previously been charged with manufacturing methamphetamine.  *Id.* at 12-13. However, Trooper Armstrong did not "know if he had a conviction or how many times" that Defendant had faced charges for manufacturing methamphetamine.  *Id.* at 22.  Trooper Armstrong also testified that his training and experience with methamphetamine and regular purchases of pseudoephedrine led him to believe that Defendant and Ms. Gray did not purchase the Sudafed for medicinal purposes.  *Id.* at 13-14.

Based on the aforementioned testimony, Trooper Armstrong decided to conduct a knock and talk with the aid of Deputy Ryan Lanigan and Deputy Daniel Isaacs.  *Id.* at 14.  Each officer drove his own marked vehicle and arrived at Defendant's residence around 7:00 p.m.  *Id.*  The officers drove in a line up Defendant's driveway, with Deputy Lanigan in the lead, Trooper Armstrong in the middle, and Deputy Isaacs in the rear.  *Id.* at 15.  Trooper Armstrong testified that upon driving around the side of Defendant's residence, the officers immediately saw

3

Defendant and Ms. Gray "standing under a shed." *Id.* Subsequently, Trooper Armstrong saw Ms. Gray run "towards the home," which sits approximately fifteen to twenty yards from the shed, "traveling about as fast as she could" considering she is "an older female." *Id.* at 15-16.

Per Trooper Armstrong's testimony, "Deputy Lanigan being the first in line got out of his car and followed [Ms. Gray] into the home." *Id.* at 15. Arriving second, Trooper Armstrong exited his vehicle and followed Deputy Lanigan and Ms. Gray. *Id.* Trooper Armstrong testified that he and Deputy Lanigan followed Ms. Gray into the home out of dual concerns for officer safety and destruction of evidence. *Id.* at 21 ("When someone runs, you want to make sure that they are not trying to get a weapon to hurt us, first of all, and second of all, not trying to destroy any evidence."). At that point, "Deputy Lanigan was already with Mrs. Gray, and she was trying to light a cigarette," and one of the officers informed her that they were there "to investigate a drug complaint." *Id.* at 17. Trooper Armstrong also testified that "when [he] did walk in the residence there was a bag of white powder in plain view on the coffee table," *id.* at 17-18, that Trooper Armstrong "believed . . . to be methamphetamine." *Id.* at 18. Relatedly, Trooper Armstrong indicated that, because the door was "standing open," *id.*, he was "able to observe from outside the trailer the items on the coffee table" to include the bag of methamphetamine. *Id.* at 19.

After making contact with Ms. Gray inside the home, Trooper Armstrong, with Deputy Lanigan present, asked her for consent to search the residence. *Id.* at 20. Upon receiving Ms. Gray's verbal consent, Trooper Armstrong went outside to the shed to ask for Defendant's consent to search the residence. *Id.* at 19. When asked, Defendant, in the presence of both Trooper Armstrong and Deputy Isaacs, also provided consent to search the residence. *Id.*

4

Neither Defendant nor Ms. Gray placed "any conditions or limitations on what could be searched." *Id.* (Ms. Gray's consent); *id.* at 21 (Defendant's consent); *id.* at 44 ("[T]hey gave verbal consent and didn't hesitate or anything.  They said, 'You can search the residence.'  So I went in and did that.").  Having received permission from both individuals, Trooper Armstrong proceeded to conduct a consent search of the residence.  *Id.* at 21.  He denied any coercion when obtaining consent from Defendant and Ms. Gray.  *Id.* at 20; 21.

On cross-examination, Trooper Armstrong testified that he "believe[d] [Deputy Lanigan] caught up with [Ms. Gray] right as she was going into the home."  *Id.* at 27.  Turning to Trooper Armstrong's safety motivation for following Deputy Lanigan and Ms. Gray across the threshold of the home, Trooper Armstrong testified that he had no knowledge of Ms. Gray's criminal history, to include any weapons-related charges, and that he did not "see anything in her hand to lead [him] to believe that she might have a weapon."  *Id.* at 28-29.  Rather, Trooper Armstrong admitted that he had "just a general concern that somebody who runs into a house where they live might be trying to get a weapon."  *Id.* at 29.  Trooper Armstrong also cited Ms. Gray's decision to run towards the house, along with the Sudafed purchases and Defendant's history of manufacturing methamphetamine, to support officer entry into the home to prevent destruction of evidence.  *Id.* at 29-30.  However, Trooper Armstrong did not recall if the Sudafed purchases exceeded legally permissible amounts or "if there were any blocked purchases on that log or not."  *Id.* at 36.

## B. Deputy Lanigan's Testimony

The United States also called Deputy Ryan Joseph Lanigan; he is currently employed by the Clay County Sheriff's Office, but on February 1, 2012, he was employed by the Jackson

County Sheriff's Office.  *Id.* at 47.  Deputy Lanigan testified that Trooper Armstrong informed him of the Sudafed purchases made by Defendant and Ms. Gray and asked if Deputy Lanigan would accompany him to the residence for a knock and talk.  *Id.* at 48.  The only other information Deputy Lanigan had about Defendant was that he had previously been charged with manufacturing methamphetamine.  *Id.* at 47.

Per his testimony, the three officers – himself, Trooper Armstrong, and Deputy Isaacs – arrived at Defendant's home between 7:00 p.m. and 7:30 p.m.  *Id.* at 49.  Arriving first in the line of marked vehicles, Deputy Lanigan saw Defendant and Ms. Gray standing in the "little shed or carport type thing" and then saw Ms. Gray "take off running toward the house" upon seeing his vehicle.  *Id.*; *id.* at 51 ("She took off running, she – like a sprint.").  Per Deputy Lanigan's estimation, Ms. Gray traveled about fifty feet from the carport to the house.  *Id.* at 52.  Deputy Lanigan testified to the following series of events occurring after exiting his vehicle:

> I seen Glenda [Gray] take off running toward the front of the residence.  I got out of my car, started to run after her.  As she was running, the front porch of the house was open.  She ran inside the residence.  And when I got in, I stepped in right behind her, she sat down, lit up a cigarette.  I asked her why she took off running from me.  She said she just needed a cigarette, and as I was talking to her, she kept looking down towards the table.  And I glanced at the table, and I seen what appeared – it was a white powder substance in a bag on the table.  It appeared to be some type of drug, narcotic.

*Id.* at 50; *id.* at 55 (confirming that he "crossed the threshold of the door"); *id.* at 65 (testifying that he pursued Ms. Gray "as soon as [he] could get the car in park and get out of the car," with the lag time being five seconds).  Based on training and experience, Deputy Lanigan believed the white substance to be methamphetamine.  *Id.* at 51.

Deputy Lanigan confirmed that Trooper Armstrong also entered the residence, having followed Ms. Gray and Deputy Lanigan.  *Id.* at 52.  Turning to his rationale for following Ms.

Gray as she ran toward the house, Deputy Lanigan testified that he was concerned with evidence destruction and officer safety. *Id.* at 54. Additionally, Deputy Lanigan confirmed that Trooper Armstrong "asked for consent from Glenda Gray to search, and she said it was all right." *Id.* at 53.

On cross examination, Deputy Lanigan stated that he did not have "any reason or any information . . . to make [him] think that [Ms. Gray] was a dangerous person." *Id.* at 57. He also was unaware of "any kind of weapons charge or any acts of violence" by Ms. Gray, and he had no information of any firearms in the residence. *Id.* at 58. Deputy Lanigan agreed that the only factor that "put up [his] antenna about officer safety" was "the fact that [Ms. Gray] ran." *Id.* Additionally, Deputy Lanigan agreed that he did not see Ms. Gray "with anything that could have been or appeared to be controlled substance or drugs or a plastic bag or anything like that outside" and that he did not "see her do anything in the residence other than light a cigarette and look at the coffee table initially." *Id.* at 62.

### C. Deputy Isaac's Testimony

Once the United States closed its evidence, the defense called Deputy Daniel Isaacs, the third officer that participated in the knock and talk on February 1, 2012. *Id.* at 68. Deputy Isaacs testified that he initially remained outside the residence with Defendant in the carport. *Id.* at 72. Per his testimony, Deputy Isaacs was present when Trooper Armstrong asked Defendant for consent to search his residence. *Id.* at 70. Deputy Isaacs confirmed that Defendant, without being coerced, "told [Trooper Armstrong] that he would give him consent to search the residence." *Id.* at 73. This consent was verbal, and Deputy Isaacs, when asked, stated that he could not recall execution of a written consent form. *Id.* at 71.

7

**D. Search Warrant**

The search warrant issued on February 1, 2011, authorized a "search of the premises known and numbered as #215 Gabbard Road, Annville, KY 40402."  D.E. 82-2 at 5.  The warrant also provided the following information concerning those premises after the lead-in language "more particularly described as follows:"

> Leaving Jackson County Judicial Center travel west for approximately 50 feet onto KY HWY #290.  Then continue traveling west on KY HWY #290 for approximately 8.8 miles to the intersection of KY HWY #3630.  Turn right and continue traveling west on KY HWY #3630 for approximately 0.5 miles to the intersection of Hellard Road.  Turn right onto Hellard Road and continue traveling north for approximately 1.4 miles to Gabbard Road which is a private dirt road.  Turn right onto Gabbard Road and continue traveling east for approximately 0.3/10 of a mile to the residence located on the left side of the roadway.
>
> The residence is further described as being a single wide mobile home being white in color with red colored trim which also has green and red colored trim on the right-end of the mobile home.  The mobile home has a built-on wooden structure attached to the backside of the residence.  Also on the backside is a small wooden covered porch with dirt floor attached to the mobile home and wood structure.
>
> Located near the mobile home is camper trailer and a separate carport containing a blue Chevy pickup displaying Kentucky License Plate #097-LGS[.]

*Id.*  This description matches the particular description contained in Attachment A of the affidavit.  *Id.* at 3.  Attachment B of the search warrant affidavit indicates that the affiant, Special Agent Bill Lang of the United States Forest Service, had previously contacted Defendant and Ms. Gray at the residence to execute outstanding arrest warrants for each.  *Id.* at 4.

**E. Post-Hearing Briefs**

Following the hearing, the Court permitted each party to file a post-hearing brief.  First addressing the 2011 warrant-backed search, Defendant contends that the "search was invalid

8

because it was conducted pursuant to a search warrant that failed to identify with sufficient particularity the location to be searched." D.E. 104 at 1. Specifically, Defendant notes that the search warrant and its supporting affidavit misidentify Defendant's residential address as 215 Gabbard Road, Annville, Kentucky. *Id.* at 3. The proper address is 1600 Hellard Road, Annville, Kentucky. *Id.* Defendant also notes that "the Gabbard Road address corresponds to another location more than four miles away from Defendant's residence on Hellard Road." *Id.* While acknowledging that Affiant Lang had previously been to Defendant's residence and thus would likely have traveled to the proper address to conduct a search, Defendant argues that a reasonable probability existed that officers unfamiliar with Defendant's residence would have proceeded to and executed the search warrant at an incorrect location due to the error in the warrant. *Id.* at 4. Because of this error, Defendant urges the Court to suppress all evidence obtained pursuant to the February 1, 2011 search. *Id.*

Turning to the February 1, 2012 search, Defendant argues that well-recognized exceptions to the warrant requirement, namely exigent circumstances and officer safety, are not applicable to this case. *Id.* at 1. First, the limited facts known to the officers at the time of the knock and talk and initial encounter with Defendant and Ms. Gray did not amount to probable cause, which is required for warrantless entry into a home under exigent circumstances and officer safety scenarios. *Id.* at 13. Second, Defendant argues that the officers' knowledge of Sudafed purchases and Defendant's prior methamphetamine manufacturing charge, coupled with Ms. Gray's decision to run toward the residence upon seeing the approaching police vehicles, was not enough to create reasonable suspicion "that contraband was present within the residence or that Gray possessed evidence of criminal activity when she attempted to retreat inside." *Id.* at

9

17.  Third, Defendant argues that the officer safety rationale fails because the officers testified to a general concern for officer safety but failed to identify specific facts about the encounter with Defendant and Ms. Gray, aside from her running toward the residence, to support an inference that she fled to retrieve a weapon to use against the officers.  *Id.* at 18.  Finally, Defendant argues that the illegal warrantless entry into Defendant's residence invalidates the consent search because no significant intervening event occurred to separate the consent search from the taint of the illegal entry.  *Id.* at 19-21.  Due to these infirmities, Defendant requests suppression of evidence found pursuant to the 2012 warrantless search.  *Id.* at 22.

In its post-hearing brief, the United States requests that the Court deny in full Defendant's Motion to Suppress Evidence.  D.E. 106 at 1.  Addressing first the 2011 search, the United States notes that the directions and particular description of the home contained in the affidavit and search warrant is not disputed by the parties.  *Id.* at 3.  Additionally, having set out the reasonable probability standard for evaluating the particularity of the location to be searched, the United States argues that the directions and specific description of the property, along with the fact that the affiant had previously been to Defendant's residence, alleviated any concern that the officers would conduct a search of the wrong property.  *Id.* at 4.  Alternatively, the United States argues that the good faith exception precludes exclusion of evidence in the event that the Court finds that the warrant lacked a particular description of the location to be searched.  *Id.* at 5.  Therefore, the United States urges the Court not to suppress evidence seized pursuant to the 2011 search warrant.  *Id.*

As for the 2012 search, the United States argues that the Court should deny suppression because the evidence was seized pursuant to a valid consent search.  *Id.*  The United States

10

argues that evidence of Sudafed purchases by Defendant and Ms. Gray, the officers' knowledge of Defendant's prior involvement in manufacturing methamphetamine, and Ms. Gray's sprinting into the residence at the sight of police arrival justified warrantless entry into the residence to secure officer safety and to prevent destruction of evidence. *Id.* at 7. Additionally, the United States argues that both Defendant and Ms. Gray consented to a search of the residence without duress or coercion. *Id.* at 8.

As permitted, Defendant filed a reply brief wherein he largely reiterated his prior arguments regarding the 2011 search warrant. D.E. 109 at 1-2. Turning to the legality of the 2012 warrantless entry, Defendant noted that the United States' brief "entirely ignores" the probable cause component of an exigent circumstances analysis. *Id.* at 3. Defendant also reiterates his prior argument that the officers' knowledge at the time of the warrantless entry failed to amount to probable cause *and* exigency. *Id.* Additionally, Defendant argues that Defendant and Ms. Gray consented to a search of residence too close in time to the officers' illegal entry, thereby undermining the validity of the consent. *Id.* at 8. Furthermore, Defendant clarifies that he "never has conceded that Gray possessed authority to give consent to search his property" and that he "has not conceded that he provided consent to search the residence." *Id.* at 6.

## II. ANALYSIS

As clarified during the hearing and in the post-hearing briefs, the Court must address the following Fourth Amendment issues: 1) whether the 2011 search warrant was invalid due to a lack of particularity as to the location to be searched, thereby requiring suppression of evidence seized; 2) whether the 2012 warrantless entry into Defendant's residence was constitutionally

proper; and 3) whether the consent search was valid if the Court finds that the warrantless entry was improper.  The Court will first address the 2011 search and then will analyze the remaining two issues concerning the 2012 knock and talk and consent search.

### A. February 1, 2011 Warrant-Backed Search

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const., amend. IV.  Probable cause to issue a search warrant exists where "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Defendant does not challenge the existence of probable cause, only the sufficiency of the description of the property to be searched.

When assessing particularity of the place to be searched, "[a]n error in description does not . . . automatically invalidate a search warrant."  *United States v. Pelayo-Landero*, 285 F.3d 491, 496 (6th Cir. 2002).  Instead, the Court must determine "whether the description is sufficient 'to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched.'"  *United States v. Durk*, 149 F.3d 464, 465 (6th Cir. 1998); *United States v. Gahagan*, 865 F.2d 1490, 1497 (6th Cir. 1989), cert. denied *Gahagan v. United States*, 492 U.S. 918 (1989) (deeming this a two-part test).  In applying this test, the Sixth Circuit has upheld technically inaccurate warrants that have included correct descriptions of unusual features on the property. *Durk*, 149 F.3d at 466.  The Sixth Circuit also considers whether the executing officer and/or affiant has previously visited the residence to be searched.  *Pelayo-Landero*, 285 F.3d at 497.

As noted above, Defendant argues for suppression of all evidence obtained during the warrant-backed search on February 1, 2011, because the search warrant listed an incorrect physical address for Defendant's residence, thereby purportedly failing to describe with sufficient particularity the location to be searched.  D.E. 104 at 4.  The United States argues that the additional description of the property provided in the search warrant, along with the affiant's familiarity with the location of Defendant's residence, are sufficient to ensure against constitutional infirmity.  D.E. 106 at 5.  For reasons stated below, the Court agrees with the United States.

Here, both parties agree that the instant search warrant and its supporting affidavit contain the wrong physical address for Defendant's residence.  However, the section of the warrant that indicates the property is "more particularly described as follows" states:

> Leaving Jackson County Judicial Center travel west for approximately 50 feet onto KY HWY #290.  Then continue traveling west on KY HWY #290 for approximately 8.8 miles to the intersection of KY HWY #3630.  Turn right and continue traveling west on KY HWY #3630 for approximately 0.5 miles to the intersection of Hellard Road.  Turn right onto Hellard Road and continue traveling north for approximately 1.4 miles to Gabbard Road which is a private dirt road.  Turn right onto Gabbard Road and continue traveling east for approximately 0.3/10 of a mile to the residence located on the left side of the roadway.
>
> The residence is further described as being a single wide mobile home being white in color with red colored trim which also has green and red colored trim on the right-end of the mobile home.  The mobile home has a built-on wooden structure attached to the backside of the residence.  Also on the backside is a small wooden covered porch with dirt floor attached to the mobile home and wood structure.
>
> Located near the mobile home is camper trailer and a separate carport containing a blue Chevy pickup displaying Kentucky License Plate #097-LGS[.]

D.E. 82-2 at 5.  By providing driving directions beginning from a readily identifiable location (and presumably the location of warrant issuance), this section of the warrant serves to aid the executing officer in putting forth a reasonable effort to locate and identify the correct property to be searched.  Additionally, the detailed physical description of the house, to include a changing color scheme on one side of the mobile home and features such as attached structures and a porch, and a description that the house is near a camper trailer and a carport with a specific licensed vehicle inside, undermines any reasonable probability that the officers would mistakenly search the wrong residence.  Finally, the Court notes that the affiant – Special Agent Bill Lang of the United States Forest Service – had been to Defendant's residence prior to procuring the instant warrant, D.E. 80 at 2, and, as evidenced by his signature on the returned inventory page, Agent Lang participated in the execution of the search warrant.

Taken together, these factors strongly favor the finding that the search warrant contained sufficient particularity to ensure that the officers searched the correct location and to guard against a search of the wrong location.  The Sixth Circuit has counseled that "[t]he evil that the framers of the Constitution were trying to eradicate with the particularity requirement was the so-called general warrant that allowed officers to search at random." *Durk*, 149 F.3d at 466.  Under the circumstances presented in this case, the search warrant in question, despite an error in the physical address, provided an ample description to ensure that the purposes of the Fourth Amendment's particularity requirement were met.  Therefore, the Court finds that suppression of the evidence obtained pursuant to the February 1, 2011 search is inappropriate and unwarranted.

### B. February 1, 2012 Warrantless Search

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend IV.  Generally speaking, a search is only reasonable under the Fourth Amendment if it is "conducted pursuant to a warrant issued by an independent judicial officer."  *California v. Carney*, 471 U.S. 386, 390 (1985).  Thus, "[t]he Fourth Amendment normally prohibits the warrantless search of an individual's home."  *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004).  A person's home includes not only the physical structure but also the surrounding property or curtilage.  *United States v. Dunn*, 466 U.S. 170 (1984).

A defendant claiming that a search violated his Fourth Amendment rights has the initial "'burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched.'"  *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quoting *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001)); *see also United States v. McNeal*, 955 F.2d 1067, 1069 (6th Cir. 1992) ("in the event that McNeal failed to meet his burden of proving a legitimate expectation of privacy in Ward's apartment, he was, as a consequence, stripped of his 'standing' to challenge the legality of the warrantless entry into Ward's residence").  There is no question that Defendant had such an expectation in his own residence.  Once a defendant demonstrates an expectation of privacy, the burden shifts to the United States to prove the validity of the search.  *United States v. Murrie*, 534 F.2d 695, 698 (1976).  The United States bears "the burden of proving the legality of a warrantless search."  *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).

15

Here, Defendant seeks to suppress evidence gained during the February 1, 2012 consent-backed search of his residence, arguing that the consent was invalid because it directly succeeded an illegal, warrantless entry into Defendant's home.  D.E. 104 at 1.  The United States argues that exigent circumstances, namely dual concerns of officer safety and destruction of evidence, justified the warrantless entry.  D.E. 106 at 7.  Additionally, the United States argues that the officers obtained valid consent from Defendant and Ms. Gray without duress or coercion.  *Id.* at 8.

### *1. Exigent Circumstances*

The Supreme Court has long recognized the sanctity of the home under the Fourth Amendment, thereby guarding against warrantless entry in all but a limited few circumstances. *See, e.g., Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("It is a 'basic premise of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" (internal citations omitted)); *United States v. United States District Court*, 407 U.S. 297, 313 (1972) (noting that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"); *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971) ("It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances'").  However, the Supreme Court has identified four types of exigent circumstances that permit warrantless entry into a home: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006).

16

Here, the United States, which bears the burden of proof, argues that warrantless entry was proper under two types of exigencies: 1) imminent destruction of evidence and 2) a risk of danger to police.   D.E. 106 at 7.   In order to justify warrantless entry to prevent imminent destruction of evidence, the United States must "demonstrate: 1) a reasonable belief that third parties are inside the dwelling; and 2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988).   Turning to warrantless entry to address a risk to police safety, the United States must prove that the officers identified "*specific* facts, which, combined with reasonable inferences from those facts, gave rise to the conclusion that the warrantless intrusion was appropriate."  *Andrews v. Hickman County*, 700 F.3d 845, 857 (6th Cir. 2012) (citing *United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir. 1984) (emphasis added).   Additionally, the United States also must prove that the officers had probable cause to enter the residence to justify warrantless entry based on either concern for destruction of evidence or concern for officer safety.   *United States v. McClain*, 444 F.3d 556, 561 (6th Cir. 2005) ("More precisely, the police may not enter a private residence without a warrant unless both 'probable cause plus exigent circumstances' exist."); *Sangineto-Miranda*, 859 F.2d at 1511, n.6 ("Exigent circumstances justify a warrantless entry into a home only where there is probable cause to enter the residence.").   Probable cause exists when, under a totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

Based on the evidence presented, the Court finds that the United States has failed to prove that the officers had probable cause to enter Defendant's residence.  First, the Court notes

that the United States completely failed to address probable cause in both its initial response and its post-hearing brief.  Second, at the time they entered Defendant's home on February 1, 2012, Trooper Armstrong and Deputy Lanigan knew only that Defendant and Ms. Gray had purchased Sudafed that day in prior months and that Defendant had previously been charged with manufacturing methamphetamine.  D.E. 103 at 12.  Neither officer knew the adjudication status of Defendant's prior charge, *id.* at 22, and Trooper Armstrong stated that he was unaware whether either individual purchased an unlawful amount of Sudafed or were refused sale.  *Id.* at 36.  Moreover, such minimal knowledge supports Trooper Armstrong's decision to recruit fellow officers to aid in a knock and talk investigation rather than to attempt, on such minimal evidence, to obtain a search warrant for Defendant's residence.  In short, the record is devoid of sufficient information to suggest there was  a fair probability that contraband or evidence of methamphetamine manufacturing would be found in Defendant's residence.   Absent such probable cause, Trooper Armstrong and Deputy Isaacs unlawfully crossed the threshold of Defendant's home without a warrant, thereby violating the Fourth Amendment.

Even if probable cause existed, the record does not support a finding that either exigency justified warrantless entry.  While both Trooper Armstrong and Deputy Lanigan testified as to general concerns about destruction of evidence in drug cases, neither officer identified specific facts, aside from Sudafed purchases, Defendant's criminal history, and an elderly woman running rather than walking fifty feet from a carport to the residence, to support a reasonable belief that destruction of evidence was imminent.  *Id.* at 21; *id.* at 29-30.  Turning to officer safety, Trooper Armstrong and Deputy Lanigan again testified about the everyday dangerousness faced by law enforcement, but admitted that they had no specific knowledge of violence in Ms.

18

Gray's past nor any indication that she was carrying a weapon or that the residence housed a weapon.  *Id.* at 28-29; *id.* at 57-58.  Absent greater specificity, the Court cannot find that the United States has met its burden to prove exigencies necessary to justify warrantless intrusion into Defendant's home.  In short, the officers unlawfully entered Defendant's home when they followed Ms. Gray into the living room.

### 2. Consent Search and Issues of Attenuation

The Court's suppression analysis does not end with a finding that the officers unlawfully entered Defendant's home on February 1, 2012.  Rather, the Court must determine if suppression of evidence is an appropriate remedy in light of the aforementioned violation.  A judicially-created remedy, the exclusionary rule exists to preclude use of evidence seized in violation of the Constitution.  *Weeks v. United States*, 232 U.S. 383 (1914) (federal exclusionary rule); *Mapp v. Ohio*, 367 U.S. 643 (1961) (state exclusionary rule).  However, the Supreme Court has noted that exclusion of evidence "has always been our last resort, not our first impulse."  *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

Here, Trooper Armstrong and Deputy Lanigan unlawfully entered Defendant's home, and while inside, both officers viewed a bag of a white, powdery substance identified, per their respective training and expertise, as methamphetamine.  D.E. 103 at 17-18; *id.* at 50-51. Subsequently, Trooper Armstrong requested and received verbal consent to search the residence from both Defendant and Ms. Gray.  *Id.* at 19-21.  Ms. Gray was inside the residence when she consented, *id.* at 19, whereas Defendant was outside the home under the carport.  *Id.* at 20.  The officers ultimately conducted a search of the residence, uncovering evidence of

methamphetamine manufacturing that led to the arrests of Defendant and Ms. Gray on February 1, 2012, and the current charge.

Because Defendant and Ms. Gray provided consent to search following the officers' unlawful entry into Defendant's home, the Court must conduct a two-part analysis.  First, the Court must determine if Defendant and Ms. Gray provided valid consent to search the residence. *United States v. Lopez-Arias*, 344 F.3d 623, 628-29 (6th Cir. 2003).  Second, if the Court finds that the consent was voluntary, the Court must then determine "whether a consent to search was sufficiently attenuated" from the officers' illegal entry into Defendant's home.  *Id.* at 630.

### a. Consent to Search

An officer does not need a search warrant if the officer receives consent from "a person with a privacy interest in the item to be searched."  *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  In order to be valid under the Fourth Amendment, consent must be given in a voluntary manner.  *Ohio v. Robinette*, 519 U.S. 33, 40 (1996).  The United States "bears the burden of proving, through 'clear and positive testimony' that the consent to search was given voluntarily."  *Ivy*, 165 F.3d at 402. Additionally, the Court should consider such factors as "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights."  *Id.*  The Court should also examine "the details of the detention, including the length and nature of the detention; the use of coercive or punishing conduct by police; and indications of 'more subtle forms of coercion that might flaw [an individual's] judgment."  *Id.* (internal citations omitted).

20

The record supports a finding that both Defendant and Ms. Gray provided voluntary consent to search Defendant's residence.  According to Trooper Armstrong, who secured consent from both individuals, the officers arrived in three separate, marked police cruisers to conduct a knock and talk at 7:00 p.m.  D.E. 103 at 14.  Trooper Armstrong secured consent from Ms. Gray almost immediately following his unlawful entry into the living room of Defendant's home.  *Id.* at 20.  When Trooper Armstrong encountered Ms. Gray, an older woman, *id.* at 15, she was sitting on the couch just inside the home with a cigarette.  *Id.* at 17.  By contrast, Defendant provided consent outside near the carport where he had been standing when the officers approached.  *Id.* at 19.  Deputy Lanigan confirmed that Trooper Armstrong secured verbal consent from Ms. Gray, *id.* at 53, and Deputy Isaacs so confirmed for Defendant.  *Id.* at 70.  All three officers opined that Trooper Armstrong obtained consent from both persons without coercion or duress.  *Id.* at 19-21, 53, 73.  Aside from statements in his briefs that Defendant does not concede consent for himself or Ms. Gray,[2] Defendant offered no evidence to contradict the officers' testimony.

The Court finds that this evidence, although not fully addressing all the factors identified in *Ivy*, demonstrates voluntary consent.  All three testifying officers were believable and trustworthy witnesses, and Defendant offered no evidence to contradict their testimony that consent was given without coercion or duress.  Additionally, Trooper Armstrong obtained consent almost immediately, thereby subjecting neither Defendant nor Ms. Gray to a lengthy detention.  While Trooper Armstrong described Ms. Gray as an older woman and minimal

---

[2]      In his Reply, Defendant claims he has never conceded that Ms. Gray had authority to provide consent.  D.E. 109 at 5-6.  However, it is undisputed that Defendant, as the resident, could provide valid consent.

intimidation would flow from the warrantless entry into the home, his testimony concerning statements she made that evening does not suggest that she was unable to intelligently communicate and understand the situation.

### b. Attenuation

When faced with voluntary consent to search, the Court may suppress evidence seized pursuant to such a search "unless the consent is sufficiently attenuated from the illegal seizure such that the consent is the product of an intervening act of free will." *Ivy*, 344 F.3d at 629 (citing *United States v. Caicedo*, 85 F.3d 1184, 1190 (6th Cir. 1996)). The United States bears the burden of proof, and the Court will consider such factors as "the length of time between the illegal [search] and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct[.]" *Id.* at 630.

Turning first to temporal proximity between the unlawful search and the consent, the Court finds no significant lapse in time. Per his testimony, Trooper Armstrong sought and gained Ms. Gray's consent to search almost immediately after entering the residence, seeing the methamphetamine on the coffee table, and informing her of the subject of the investigation. Shortly thereafter, Trooper Armstrong went outside and secured consent from Defendant. Because of the short period of time between the unlawful entry of the residence and the consent to search, this factor does not favor attenuation.

The next factor concerns the presence of intervening circumstances between the unlawful entry and the consent to search. The only intervening occurrence between entry and consent was the sighting by both entering officers of the bag of methamphetamine on the coffee table. Because the officers were not lawfully present, a plain view theory, which, if successful, could

22

favor attenuation, is not applicable. *See United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (detailing the four factors, to include that the officer must be legally present when viewing the evidence in plain view). As with its temporal proximity cousin, this factor does not favor attenuation.

The final factor centers around the purpose and flagrancy of the misconduct at issue. In many cases, this is the "most important" factor in the attenuation analysis because "'it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct.'" *United States v. Shaw*, 464 F.3d 615, 630 (6th Cir. 2006) (quoting *United States v. Reed*, 349 F.3d 457, 464-65 (7th Cir. 2003)); *United States v. Gray*, 491 F.3d 138, 155 (4th Cir. 2007) ("The primary focus of attenuation analysis is whether or not the deterrent purpose of the exclusionary rule is served by suppression."). This factor weighs heavily in favor of attenuation. While each officer approached the residence in his own marked police car, the headlights illuminated the vehicles but nothing in the record suggests that the officers employed their sirens. Aside from chasing Ms. Gray as she ran into the residence, the record contains no evidence of coercive practices or actions that would suggest unlawful seizure of Defendant and Ms. Gray. Additionally, despite the unlawful nature of the entry, Trooper Armstrong and Deputy Lanigan merely remained in the entry way/living room of the residence and spoke with Ms. Gray about their investigation. There is no indication that the entry itself was "undertaken to advance the investigation or to embark on a fishing expedition." *Reed*, 349 F.3d at 465. Nor does the evidence indicate that the entry itself was designed and executed "'in the hope that something might turn up.'" *United States v. Williams*, 615 F.3d 657, 670 (6th Cir. 2010) (quoting *Brown v. Illinois*, 422 U.S. 590, 605 (1975)). No officer seized the sighted bag of methamphetamine or

23

attempted to conduct a further search the premises until Trooper Armstrong secured consent from both Defendant and Ms. Gray.  Based on these circumstances, this factor favors attenuation.

Ultimately, suppression of evidence is a remedial sanction employed not to rectify an invasion of Defendant's Fourth Amendment rights but rather to act as a deterrent against similar official misconduct in the future.  *See, e.g., United States v. Leon*, 468 U.S. 897, 906 (1984). While the Court is troubled by the officers' unlawful entry into Defendant's home, the limited nature of the infraction does not amount to the serious misconduct that the exclusionary rule has been crafted to address.   Even though temporal proximity and a lack of intervening circumstances do not favor attenuation, the officers' behavior does not amount to flagrant misconduct necessary to justify suppression.   The Supreme Court has recognized that "[a]ttenuation also occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."  *Hudson*, 547 U.S. at 593.  Here, the interest in preventing unlawful entry would not be served by suppressing evidence gained through a subsequent consent-based search. Therefore, the Court finds that the consent is sufficiently attenuated from Trooper Armstrong and Deputy Lanigan's unlawful entry, and the fruits of the consent-based search should not be suppressed.

### III. RECOMMENDATION

For the reasons stated above, the Court finds that the 2011 search warrant contained sufficient particularity as to the location to be searched.  Additionally, while the Court finds that the officers violated Defendant's Fourth Amendment rights by entering his home without a warrant, the Court also finds that Defendant King and Co-Defendant Gray validly consented to a

search of the residence.  Furthermore, the Court finds that consent to search was sufficiently attenuated from the officers' unlawful entry.  Therefore, the Court **RECOMMENDS** that the District Court District Court **DENY** Defendant's Motion to Suppress Evidence (D.E. 80).

**THE PARTIES SHALL TAKE NOTICE OF THE SHORTENED OBJECTIONS PERIOD BELOW.**

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute.  Pursuant to § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), any party may serve and file written objections to any or all portions for de novo consideration by the District Court.  **GIVEN THE IMPENDING TRIAL DATE AND PRETRIAL DEADLINES, ANY SUCH OBJECTIONS SHALL BE FILED ON OR BEFORE JUNE 7, 2013.**  *See* Fed. R. Crim. P. 59(b)(2) (stating that the court may set an objection period different than the default provided under the Rule). The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 30th day of May, 2013.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge