UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Criminal No: 12-57-GFVT |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| ROGER D. KING, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon the Magistrate Judge's Recommended Disposition (also known as a "Report and Recommendation," or "R&R") [R. 119] of the Motion to Suppress [R. 80] filed by Defendant Roger King.  In the R&R, the Magistrate Judge recommends that the Court deny the motion as to both issues presented: (1) the warrant issued in 2011, and (2) the search that was conducted in 2012.  King objected to the R&R, challenging both of the Magistrate Judge's decisions. [R. 122]

The Magistrate Judge ruled that the 2011 warrant was particular enough in its description of King's property that the inaccurate address did not invalidate the warrant.  Suppression is sought on the basis that there is a "reasonable probability that another location could be searched" because of this mistake. [R. 122 at 2.]

The fruits of a 2012 search were not suppressed by the Magistrate Judge because he found that King and co-defendant Glenda Gray consented to a search.  This consent was obtained after two law enforcement officers entered King's residence without

constitutional justification and saw a bag that they suspected contained methamphetamine.  Nevertheless, the Magistrate Judge found the consent was adequately attenuated from the illegal entry.  That conclusion is challenged.

King did not contest the factual recitation provided by the Magistrate Judge.  His objections, in essence, ask the Court to review only the application of the law to the facts. [R. 122.]  In response to King's objection, the Court has conducted a *de novo* review of the analysis, *see* 28 U.S.C. 636(b)(1), and for the reasons set forth below, King's Motion to Suppress [R. 104] will be DENIED IN PART and GRANTED IN PART.

## I

The administrative error of placing an incorrect address on the search warrant is glaring, especially when the listed address is several miles away from the proper location. [R. 119 at 9.]  However, precedent holds that such a mistake does not categorically invalidate a warrant. [*Id*. at 12 (citing *United States v. Pelayo-Landero*, 285 F.3d 491, 496 (6th Cir. 2002)).]  Rather, a two-step inquiry is then required, as the R&R explains. [R. 119 at 12.]  King contests the second step in this analysis: "whether there is any reasonable probability that another premises might be mistakenly searched."  There is no reasonable probability of that happening.

The fact favoring King's position is that the address was wrong.  The warrant stated that the residence to be searched was 215 Gabbard Road, Annville, Kentucky, while the proper address is 1600 Hellard Road, Annville, Kentucky. [R. 119 at 9.]  In opposition to that fact stands a mountain of evidence.  First, the warrant explains in painstaking detail the directions one should follow to find 1600 Hellard Road. [R. 119 at 8 (describing driving distances to the tenth of a mile).]  Second, the actual residence—a

single-wide mobile home—is described in similar detail. [*Id.*]  The mobile home has red colored trim and red and green colored trim on the right side of the residence; there is a "built-on wooden structure attached to the backside of the residence"; and a wooden roof protects a dirt floor that serves as a porch, which is also attached to the home. [*Id.*]  It is highly unlikely that the residence at 215 Gabbard Road would look similar—even if it was also a mobile home. [*Id.*]  Third, a carport that housed a "blue Chevy pickup displaying Kentucky License Plate #097-LGS" was included in the description. [*Id.*]  And perhaps most importantly, the law enforcement officer who obtained the warrant and helped conduct the search had previously visited this exact residence to serve King with an outstanding arrest warrant. [*Id*. at 14, 8; *see Pelayo-Landero*, 285 F.3d at 497 (finding support for the warrant being specific enough in part because of the executing officer's previous visit to a residence).]

It is unfortunate that the address was wrong, but as explained in *Pelayo-Landero*, "courts routinely uphold warrants like the one at issue where one part of the description might be inaccurate but the description has other accurate information to identify the place to be searched with particularity." *Pelayo-Landero*, 285 F.3d at 497 (citing *United States v. Durk*, 149 F.3d 464, 466 (6th Cir. 1998)).  "Practical accuracy rather than technical nicety" is the guiding principle in resolving this issue. *Id*. at 496 (quotation omitted).  Under this set of facts, there is no reasonable way the accuracy could be compromised.  Accordingly, the Court finds King's objection meritless.

## II

### A

In 2012, three law enforcement officers, driving separate, marked patrol cars, visited King's residence to engage in a "knock and talk." [R. 119 at 3.]  This constitutionally permissible investigative technique involves law enforcement visiting an individual at his residence in order to engage him in conversation. *Turk v. Comerford*, 488 F. App'x 933, 947 (6th Cir. 2012) (citing *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 652 (6th Cir. 2006)).  Once officers arrived at King's residence, the encounter quickly transformed.  As the officers drove down the lane that led to King's residence, they spotted King and Gray standing under the roof of a detached building. [R. 119 at 3-4.]  Gray responded to the officers arrival by running from the building towards the residence; King did not move. [*Id*. at 4.]

The first officer to arrive exited his car and bolted towards Gray. [*Id*.]  He caught up to her just as she arrived at the front porch of the residence and followed her, without her consent, across the mobile home's threshold. [*Id*. at 6.]  Shortly following, the second officer entered the residence. [*Id*.]  Both officers saw a bag of white powder—methamphetamine, they suspected—sitting on a coffee table in the room into which the exterior door opened. [*Id*. at 4, 6.]  Gray was then asked if she consented to a search of the residence, and she orally confirmed, as testified to by both officers. [*Id*. at 19.]

King remained under the structure while Gray ran. [*Id.* at 7.]  The third officer to arrive approached him. [*Id*.]  A short time after Gray consented, the second officer left her so he could talk with King. [*Id*. at 22.]  Oral consent to search was then obtained from King. [*Id*.]

4

The R&R concluded that although the officers entered the residence unlawfully, [*id.* at 19] Gray and King voluntarily consented to the officers' search request [*id.* at 21-22].  Furthermore, the consents were sufficiently attenuated from the officers' illegal behavior. [*Id.* at 24.]  King challenges the conclusion that attenuation occurred [R. 122 at 6] and that his consent was voluntary [*id.* at 3].

As an initial matter, the Court concurs with the Magistrate Judge's finding that law enforcement illegally entered the residence.  The information supporting the officers suspicion about King and Gray was minimal: King and Gray purchased Sudafed in several consecutive months and King previously faced a charge of manufacturing methamphetamine. [R. 119 at 18.]  The officers did not know the final adjudication of the charge against King or if either party tried to make a prohibited purchase of medication. [*Id.*]  Suspicion of wrongdoing may have increased after Gray ran towards her residence as the officers approached, but that did not alter the known facts so much that probable cause—"a fair probability that contraband or evidence of a crime will be found in a particular place," *Illinois v Gates*, 462 U.S. 213, 238 (1983)—was present. *See United States v. Smith*, 594 F.3d 530, 540 (6th Cir. 2010) (citing several cases holding that flight can justify a finding of reasonable suspicion).  Without probable cause, exigent circumstances, e.g., imminent destruction of evidence or danger to police, cannot be found. *United States v. McClain*, 444 F.3d 556, 561 (6th Cir. 2005).  Entry of the mobile home was, thus, illegal.

That finding establishes the framework for the analysis of King's remaining objections.  "When an individual consents to a search after an illegal entry is made, consent is not valid and 'suppression is required of any items seized during the search,

unless the taint of the initial entry has been dissipated before the "consent[]" to search [was] given.'" *United States v. Hardin*, 539 F.3d 404, 424 (6th Cir. 2008) (quoting *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990)).  Finding dissipation "ordinarily involves showing that there was some significant intervening time, space, or event." *Buchanan*, 904 F.2d at 356; *see also United States v. Smallwood*, 2010 WL 4008280, at *11 (W.D. Ky. Oct. 12, 2010).  *United States v. Watson*, 489 F. App'x 922, 927 (6th Cir. 2012) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)), suggests the attenuation analysis requires weighing four factors: "the voluntariness of [the consent], the temporal proximity of the illegality and the evidence at issue, whether intervening circumstances are present, and whether the official conduct was purposeful and flagrant." The burden of showing consent was not tainted is borne by the United States. *Buchanan*, 904 F.2d at 356; *see also United States v. Gamez*, 389 F. Supp. 2d 975, 981-82 (S.D. Ohio 2005).

## B

The Magistrate Judge concluded that in spite of the short time interval and lack of intervening events, King (and Gray) voluntarily consented to a search, and the officers' conduct was neither purposeful nor flagrant. [R. 119 at 21, 23.]  The balancing of those factors resulted in finding attenuation.  In reviewing that conclusion through use of the same factors, a contrary conclusion is reached by the Court.  Consequently, the items seized from King's residence after the illegal entry in 2012 will be suppressed.

"While a 'suspect's knowledge of a prior illegal search can give rise to a sense of futility,' such that his spoken consent should be considered involuntary, it is best considered as part of the totality of the circumstances surrounding the arrest." *United*

*States v. Cochrane*, 702 F.3d 334, 343 (6th Cir. 2012) (quoting *Haynes*, 301 F.3d at 683).

Weighing those circumstances, an illegal search has rendered consent involuntary when

"the prior search was part of the same series of events that culminated in the consent to

search." *Id*. (citing *Haynes*, 301 F.3d at 683-84; *United States v. Beauchamp*, 659 F.3d

560, 573-74 (6th Cir. 2011)).  At the opposite end of the spectrum, consent is more likely

to be found voluntary when, for instance, an illegal search occurred one month before an

individual consented. *See id*.  Several other important considerations regarding consent

were identified, including age, education, intellectual ability, comprehension of the right

to refuse the request, and any sort of coercive influence exhibited by the officers. [R. 119

at 20-22.]

   The Court agrees with the findings of the R&R that the latter factors all favor the

United States' position. [*Id*.]  Yet, the sense that refusing to consent was akin to "closing

the barn door after the horse is out" is overwhelming. *United States v. Haynes*, 301 F.3d

669, 683 (6th Cir. 2002) (quoting *United States v. Furrow*, 229 F.3d 805, 814 (9th Cir.

2000)); *see also United States v. Chambers*, 395 F.3d 563, 570 (6th Cir. 2005) (vacated

on other grounds); *United States v. Allen*, 771 F. Supp. 2d 752, 762 (W.D. Ky. 2011).

Trained law enforcement personnel and attorneys might very well have invoked a right to

refuse the search when faced with this situation.  For most, though, that choice would

have been counterintuitive.

   The facts are clear that mere moments passed between the illegal entry, Gray

being notified that the officers were visiting to "investigate a drug complaint," [R. 119 at

4] the officers visual recognition of what they suspected was a bag of methamphetamine,

and Gray's consent. [*Id.* at 4, 22.]  It should be noted that it seems obvious that Gray

7

knew the officers saw the bag before she was asked for consent. [*Id*. at 6.]  One officer immediately left Gray's presence to seek King's consent, which he gave.[1] [*Id*. at 4.] Although the specific amount of time separating search and consent is not identified, the description of the circumstances suggest only minutes passed. [*Id*. at 22.]  Thus, as the Magistrate Judge noted, this factor favors a finding that attenuation did not occur.  *See Beauchamp*, 659 F.3d at 573-74 ("The absence of any intervening time between the seizure and consent strongly suggests that the taint of the illegality did not dissipate.") (citing *Brown* 422 U.S. at 604 (two hours); *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003) (thirty minutes); *United States v. Richardson*, 949 F.2d 851, 859 (6th Cir. 1991) (twenty minutes); *Buchanan*, 904 F.2d at 356 (one hour)).

Intervening circumstances are defined as "those that sever the causal connection between the illegal [action] and the discovery of the evidence." *Beauchamp*, 659 F.3d at 574 (quoting *United States v. Shaw*, 464 F.3d 615, 628-29 (6th Cir. 2006)).  For example, when a suspect commits a new crime after law enforcement has committed an illegal action, evidence that is discovered in the process of the arrest for the new crime will not be suppressed. *Id.*; *Shaw*, 464 F.3d at 630 (citing examples of intervening circumstances—confession several days after arrest, appearance before a magistrate, and discussions with counsel).  An intervening circumstance does not exist here, and in fact, the causal chain could hardly be more closely connected.

The final factor has been identified as the most important in many cases because "it is tied directly to the rationale underlying the exclusionary rule, deterrence of police

---

[1] King's claim that he "knew that contraband was in plain view within the room where Deputy Lanigan and Trooper Armstrong had followed and seized Gray" [R. 122 at 5] was unsupported by citation to any evidence—testimony from the hearing on the motion to suppress or otherwise. Accordingly, this cannot be considered in support of King's objection.

misconduct." *Shaw*, 464 F.3d at 630 (quoting *United States v. Reed*, 349 F.3d 457, 464-65 (7th Cir. 2003)). Here, it weighs in favor of attenuation.

The officers purpose was to investigate suspicious behavior via the judicially sanctioned practice of a knock and talk. Furthermore, the officers entry, albeit illegal, was benign. After Gray ran, the officers suspicion was justifiably heightened. They responded by chasing her, and they caught up to her near the threshold of her residence. Illegal entry into the residence occurred, but there is no evidence this occurred because an unlawful search was intended. Rather, the officers acted as an individual would when closely following someone with whom they are interacting and who enters a building. This purpose can be juxtaposed against that found in *Shaw*, in which the police admitted they did not have probable cause to arrest a suspect but proceeded to subject that individual to several custodial interrogations. 464 F.3d at 631; *see also Beauchamp*, 659 F.3d at 574 ("[The officer] did not have reasonable suspicion to stop and detain him. Even if the stop had been legal, the district court found that [the officer] did not have probable cause to make an arrest until after he pulled back Beauchamp's underwear on a public street and looked inside."). For the same reasons, the Court finds the officers' conduct was not flagrant.

### III

In balancing those factors, the Court finds no attenuation. Consent appears to be voluntary in the sense that King and Gray comprehended what was requested of them and affirmatively answered the officers' requests. Also, it is worth reiterating that the Court is sympathetic to the officers' actions and mindful that suppression of evidence should be done circumspectly and to further the goals of deterring police misconduct. *E.g.*, *United*

9

*States v. Master*, 491 F. App'x 593, 595 (6th Cir. 2012) (citations omitted).  But the fact remains that the "home is afforded the greatest amount of protection" from intrusion by the government. *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).  And consent obtained after an illegal entry is presumptively tainted. *Id*. (quoting *Payton*, 445 U.S. at 586).  Because almost no time passed nor was there an intervening event between illegal entry and discovery of drugs, the overriding sense is that refusing consent was like "closing the barn door after the horse is out." *Haynes*, 301 F.3d at 683.  Consequently, the taint did not dissipate and the evidence must be suppressed.

Having reviewed the Magistrate Judge's R&R, and the Court being otherwise sufficiently advised, it is **HEREBY ORDERED** as follows:

(1)     King's Motion to Suppress [R. 104] is **GRANTED**;

(2)     King's Objection [R. 122] to the Magistrate Judge's R&R [R. 119] is **SUSTAINED**;

(3)     The Magistrate Judge's R&R [R. 119] will be **ADOPTED** as to the factual findings and the legal standards but will be **OVERRULED** as to the conclusion;

(4)     The trial date will remain as scheduled on August 13, 2013 as set in the Court's recent order. [R. 149.]

This 15th day of July, 2013.



Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**